1  Allan B. Cooper (SBN 60862)
       acooper@ecjlaw.com
2  **ERVIN COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Ninth Floor
3  Beverly Hills, California 90212-2974
   Telephone  (310) 273-6333
4  Facsimile  (310) 859-2325

5  Of Counsel:
   Robert J. Burvant
6  **KING, KREBS & JURGENS, PLLC**
   201 St. Charles Avenue, Suite 4500
7  New Orleans, Louisiana  70170
   Telephone:  (504) 582-3800
8  Facsimile:  (504) 582-1233

9  Attorneys for Plaintiff FEDERAL DEPOSIT
       INSURANCE CORPORATION, as Receiver
10     for PACIFIC COAST NATIONAL BANK

11

12              **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14

15  FEDERAL DEPOSIT INSURANCE          Case No. SACV12 1938 JVS (MLbx)
    CORPORATION, as Receiver for
16  PACIFIC COAST NATIONAL BANK,       **COMPLAINT**

17              Plaintiff,

18        v.

19  MICHAEL S. HAHN, COLIN M.
    FORKNER, MICHAEL V.
20  CUMMINGS, RICHARD S.
    GRINYER, STANLEY M. CRUSE and
21  DAVID L. ADAMS,

22              Defendants.

23

24        Plaintiff Federal Deposit Insurance Corporation ("FDIC"), as Receiver

25  ("FDIC-R") for Pacific Coast National Bank ("PCNB" or "Bank"), files this

26  Complaint against Defendants Michael S. Hahn ("Hahn"), Colin M. Forkner

27  ("Forkner"), Michael V. Cummings ("Cummings"), Richard S. Grinyer ("Grinyer"),

28  Stanley M. Cruse ("Cruse"), and David L. Adams ("Adams") (collectively the

14609.1:1710169.1

COMPLAINT

"Defendants") for negligence, gross negligence, and breaches of fiduciary duty, and states as follows:

## I.    **INTRODUCTION**

1.    FDIC-R brings this lawsuit in its capacity as receiver for PCNB, a failed financial institution, against six of PCNB's former officers and/or directors. The FDIC-R seeks to recover damages resulting from Defendants' negligence, gross negligence, and breaches of fiduciary duty in operating and managing the lending function of the Bank and allowing loans to fund in violation of the Bank's policies and safe and sound banking practices.

2.    Defendants regularly failed, neglected, or refused to fully and properly discharge their duties and obligations in operating and managing the Bank's lending function.  The actions and omissions that give rise to Defendants' liability include, among other things, originating, recommending, and/or approving loans in violation of the Bank's own written loan policies; extending credit to borrowers who were not creditworthy or were known to be in financial difficulty; originating, recommending and/or approving participation loans without conducting independent underwriting; extending credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow and other critical financial information; approving and originating speculative commercial real estate loans despite known adverse economic conditions in the local real estate market; permitting unsafe and unsound concentrations of credit; failing to properly manage and preserve the resources of the Bank; and failing to supervise, manage, conduct, and direct the business and affairs of the Bank to ensure compliance with prudent principles of banking.

3.    The Bank suffered significant damages as a result of Defendants' failure to properly operate and manage the Bank's lending function and allowing loans to fund in violation of the Bank's policies and safe and sound banking practices.  Defendants are liable to the FDIC-R for compensatory and other damages

1  PCNB sustained as a result of the Bank funding loans without proper underwriting

2  or review.

3  **II.**   **THE PARTIES**

4      **A.**   **The Plaintiff**

5      4.     FDIC is an instrumentality of the United States of America, established

6  under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its

7  principal place of business in Washington, D.C.  12 U.S.C. § 1821(d).  Among other

8  duties, the FDIC-R is charged with the orderly liquidation of failed banks.  12

9  U.S.C. § 1821(d).

10      5.     On November 13, 2009, the Office of the Comptroller of the Currency

11  ("OCC") closed PCNB and appointed FDIC as Receiver.  Plaintiff, FDIC-R, is the

12  successor to, among other things, all rights, titles and privileges of PCNB and its

13  stockholders, account holders, and depositors.  12 U.S.C. § 1821(d)(2)(A)(1).

14      **B.**   **Defendants**

15      6.     Hahn was President and Chief Operating Officer ("COO") of PCNB

16  from the Bank's inception on May 16, 2005, to May 16, 2008, and was Chief

17  Executive Officer ("CEO") from May 16, 2008, until August 19, 2009, when he was

18  demoted to Vice President.  Hahn was also a director of PCNB from the Bank's

19  inception until its closure.  At all material times, Hahn oversaw the day-to-day

20  operations of the Bank.

21      7.     Forkner was the Bank's CEO from May 16, 2005, until May 16, 2008,

22  when he was replaced by Hahn, and was also a director of PCNB from May 16,

23  2005, until the Bank closed.  As CEO, Forkner was responsible for the execution of

24  the Bank's credit program.

25      8.     Cummings was Chairman of PCNB's Directors Credit Committee

26  ("DCC") and a director from the Bank's inception on May 16, 2005, until the Bank

27  closed.  In his role as DCC Chairman, Cummings functioned as a member of the

28  Bank's executive management team ("EMT") regarding its lending operations.  He

ERVIN COHEN & JESSUP LLP

1   reviewed and approved internal credit recommendation memoranda ("CRM") from

2   loan officers before large loans were submitted to the DCC or Board for approval

3   and assisted with the oversight of the Bank's Chief Credit Officers.  Cummings also

4   served as a paid lending consultant from time to time, assisting the Bank with credit

5   policies and procedures.

6       9.   Grinyer was Chief Credit Officer ("CCO") of the Bank and a director

7   from May 16, 2005, until April 16, 2007, when he was demoted to loan officer and

8   resigned from PCNB's Board.  As CCO, Grinyer was responsible for establishing

9   and maintaining the Bank's credit policy and was charged with initiating and

10  maintaining the quality, safety, and soundness of the Bank's credit portfolio.

11      10.   Cruse was the Bank's CCO from June 1, 2007, until his resignation on

12  November 17, 2008.  As CCO, Cruse was responsible for establishing and

13  maintaining the Bank's credit policy and was charged with initiating and

14  maintaining the quality, safety, and soundness of the Bank's credit portfolio.

15      11.   Adams was hired on April 30, 2007, as Executive Vice President

16  ("EVP") and Real Estate Industries Group Manager to lead the Bank's growing real

17  estate construction portfolio.  Adams received a brokerage commission on most of

18  the loans he originated at PCNB, thereby incentivizing him to make loans even as

19  the local and national economy crumbled.  He was also CCO from November 17,

20  2008, until he resigned on June 5, 2009.

21  **III.   JURISDICTION AND VENUE**

22      12.   This Court has subject matter jurisdiction over this case pursuant to 12

23  U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331

24  and 1345.

25      13.   This Court has personal jurisdiction over Defendants who at all

26  relevant times were residents of, and conducted the business of the Bank, in the

27  State of California.

28      14.   Venue is proper in this district under 28 U.S.C. § 1391(b) because a

ERVIN COHEN & JESSUP LLP

14609.1:1710169.1

4

COMPLAINT

1   substantial portion of the events and/or omissions giving rise to the claims and
2   damages asserted herein occurred in this district.

3   **IV.   THE BANK'S LENDING FUNCTION AND LOAN PORTFOLIO**

4   15.   Loan underwriting practices are the primary determinant of bank credit
5   risk and bank credit availability and one of the most critical aspects of loan portfolio
6   management.  Loan underwriting standards define a bank's desired level of
7   creditworthiness for individual loans and provide uniform criteria for evaluating
8   loans with similar characteristics.  It is also important in protecting bank capital,
9   which can erode from unsafe and unsound lending practices.

10   16.   Underwriting practices (which are described in Part 364 and 365 of the
11   FDIC Rules and Regulations) can generally be characterized by the criteria used to
12   qualify borrowers, loan pricing, repayment terms, sources of repayment, and
13   collateral requirements.  Underwriting practices also encompass the management
14   and administration of the loan portfolio, including its growth, concentrations in
15   specific markets, out-of-area lending, written lending policies, and adherence to
16   written underwriting policies.

17   17.   Commercial real estate ("CRE") and acquisition, development and
18   construction ("ADC") loans are known to be more speculative than other types of
19   loans because of, among other reasons, the lack of present cash flow source,
20   uncertainties of development and sale, and the need for adequate secondary sources
21   of repayment.  Prudent lending in this segment of banking requires sound
22   underwriting, timely evaluation and response to economic trends impacting the
23   industry, and strict adherence to prudent lending policies and standards.  Moreover,
24   concentrating a loan portfolio in CRE/ADC loans increases a bank's risk for
25   numerous reasons, including:  (a) concentration in any sector of the economy
26   increases risk resulting from that sector's downturn; (b) the housing market, in
27   particular, is cyclical by nature; (c) the primary source of repayment is cash flow
28   from the sale of the real estate collateral; and (d) historically, bank failure rates

ERVIN COHEN & JESSUP LLP

14609.1:1710169.1

5

COMPLAINT

closely correlate with high CRE/ADC concentrations.  In short, concentrations of CRE/ADC loans in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices.  It is imperative that the known risks inherent in such high loan concentrations be managed by, at a minimum, management oversight, strategic planning, underwriting, risk assessment and monitoring of CRE/ADC loans, portfolio risk management, management information systems, market analysis, and stress testing.

18.     Regulatory agencies periodically reminded financial institutions of the risks involved in ADC/CRE lending.  On October 8, 1998, the FDIC issued Financial Institution Letter 110-98, which warned financial institutions of the risk inherent in ADC lending in a favorable real estate market, including an oversupply of developed property.  Among other things, FIL 110-98 stated that "ADC lending is a highly specialized field with inherent risks that must be managed and controlled to ensure that this activity remains profitable."

Similarly, on December 12, 2006, the OCC, FDIC, and Board of Governors of the Federal Reserve System jointly issued "Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices," which specifically warned banks that "[c]oncentrations of credit exposure add a dimension of risk that compound the risk inherent in individual loans."

## V.     FACTS

### A.     History of PCNB

19.     PCNB opened for business on May 16, 2005, with a main office in San Clemente, California, and a branch office in Encinitas, California.  PCNB commenced operations with $19.5 million in capital but was unprofitable every year of its brief existence.

20.     PCNB's original business plan emphasized community banking and Small Business Administration ("SBA") Sections 7(a) and 504 loans.  Due to slow

ERVIN COHEN & JESSUP LLP

growth in SBA lending and higher than anticipated operating losses, in 2007, under Forkner and Hahn's leadership, the Bank implemented an aggressive growth strategy to expand CRE and ADC lending to generate profits.

21.     Hahn, the COO during this time period, was in charge of the Bank's day-to-day operations and spearheaded the push to grow the Bank's CRE and ADC loan portfolio.  Adams was hired to grow the loan portfolio and was rewarded with commissions for loan originations.

22.     Pursuant to PCNB's loan policy, primary control of the Bank's lending function was delegated to the Bank's Executive Management Team ("EMT") – CEO (Forkner), COO (Hahn), and CCO (Grinyer or Cruse), with Cummings also serving in that capacity as Chairman of the DCC and a part-time paid lending consultant of the Bank.  The EMT was responsible for assuring that the Bank's credit policies were administered within regulatory and Bank guidelines and that loans conformed to the Bank's loan policy and were approved within established guidelines.  The EMT, including Cummings, reviewed, signed, and approved the Credit Recommendation Memoranda ("CRM"), prepared by the originating loan officer, prior to presentation to the DCC or full Board.  The originating loan officers were responsible for documenting and preparing the CRM, ensuring that that the loan files were complete and that the CRM included all relevant information and accurately analyzed the strengths and weaknesses of the loan, repayment sources, project feasibility, and borrower viability.

23.     As a result of management's push to grow the Bank's loan portfolio, PCNB's assets increased by 100 percent in 2007, and another 27 percent in 2008.  By March 31, 2008, ADC and CRE loan portfolios represented 582 percent of capital.  By September 30, 2009, ADC and CRE loans were 2,082 percent and 866 percent of capital, respectively.

24.     Despite this aggressive growth, the EMT did not take precautions to ensure that the Bank's credit policies and procedures were followed, and that loans

1  conformed to the Bank's loan policy.  Instead the EMT allowed unbridled growth in

2  a declining market and routinely recommended and approved CRM that lacked

3  complete and accurate borrower financial information, failed to fully analyze

4  repayment sources and borrower viability, and in the case of participation loans,

5  lacked independent loan underwriting.

6       25.    Due to the deficient credit administration, loan underwriting, and risk

7  management allowed by Defendants in originating, recommending, and/or

8  approving high-risk ADC and CRE loans, many after the local real estate markets

9  began to decline, the Bank's financial condition deteriorated in 2008 and 2009.  As

10  of March 31, 2008, the Bank's classified assets exceeded 46 percent of Tier 1 capital

11  plus the allowance for loan and lease losses ("ALLL").  By March 31, 2009, the

12  classified assets had grown to more than 163 percent of Tier 1 capital plus the

13  ALLL.  PCNB failed on November 13, 2009.

14      **B.**    **Regulatory History**

15       26.    As a national bank, PCNB was subject to the supervision of the OCC,

16  which conducted regular examinations of the Bank and provided a Report of

17  Examination ("RoE") at the conclusion of each examination.

18       27.    As early as the March 31, 2006 RoE (delivered on August 3, 2006),

19  examiners cited instances of liberal underwriting and inadequate internal appraisal

20  reviews.

21       28.    Each RoE between 2006 and 2009 reported that the Bank's credit risk

22  was increasing.  The December 31, 2006 RoE (delivered April 2, 2007) criticized

23  the Bank's 2007 budget, which called for loan growth of 200 percent, as "overly

24  aggressive."  While slightly adjusting its 2007 budget, the Bank nevertheless

25  proceeded with extremely aggressive loan growth in 2007.  That RoE also cited

26  additional examples of liberal underwriting, specifically citing commercial loans

27  secured by equipment and accounts receivable without a strong source of

28  repayment.

ERVIN COHEN & JESSUP LLP

1    29.    The March 31, 2008 RoE (delivered April 14, 2008) identified a

2 number of weaknesses in the Bank's credit risk management.  That RoE cited the

3 Bank's overly aggressive strategic plan as resulting in extremely high levels of

4 construction and CRE loans, a failure to independently analyze participation loans

5 purchased from other banks, inadequate appraisal review, and reduced credit risk

6 oversight.

7    30.    The March 31, 2009 RoE (delivered April 6, 2009) reported that the

8 Bank's strategy to grow the loan portfolio despite indicators of an economic

9 downturn was contrary to safe or sound banking practices, specifically holding

10 Forkner and Hahn responsible.  This RoE also cited a lack of strong CCOs, stating

11 that none of them "appeared to be capable."  The March 31, 2009 RoE also

12 specifically cited the Bank's weak underwriting of SBA loans.  The Bank's

13 aggressive growth in high-risk loans resulted in critically deficient asset quality and

14 a sharp increase in credit losses.

15    31.    As a result of the March 31, 2009 RoE, the OCC and the Bank entered

16 into a Consent Order on August 16, 2009.  However, PCNB's capital continued to

17 deteriorate as more of its speculative loans experienced charge-offs, and the OCC

18 closed PCNB on November 13, 2009.

19    **C.    PCNB's Corporate Loan Policy**

20    32.    PCNB's directors established a comprehensive Corporate Loan Policy

21 dated February 22, 2006, and amended from time to time thereafter (hereafter the

22 "Loan Policy").  The PCNB Loan Policy set forth the specific responsibilities of the

23 Bank's loan originators, the CCO, and the EMT.

24    33.    In addition, the PCNB Loan Policy established the following loan

25 approval authorities, as amended, but not materially, from time to time:

26        a.    Hahn and Forkner each had independent authority of $500,000.

27        b.    the EMT, by unanimous vote, had authority of up to $1.2

28 million.

ERVIN COHEN & JESSUP LLP

c.      the EMT, by unanimous vote and with the consent of Cummings as DCC Chairman, had authority of up to $1.4 million.

d.      All loans above $1.4 million required the recommendation of the EMT and Cummings via an approved CRM, with loans up to $1.8 million to be approved by the DCC, and loans in excess of $1.8 million requiring the approval of the full PCNB Board.

34.    The PCNB Loan Policy contained extensive provisions regarding the underwriting and administering of various types of commercial loans, including but not limited to real estate loans, construction loans, equipment financing loans, and SBA loans.  Defendants violated and/or ignored numerous provisions of the PCNB Loan Policy, including but not limited to the following:

a.      ADC and CRE loans were designated as speculative, required caution and were reserved for the Bank's strongest customers.

b.      The Bank's geographical lending area was designated as San Bernardino, Riverside, Orange, and San Diego Counties.

c.      Real estate loans in excess of $250,000 required a complete written appraisal of the underlying collateral, less than six months old, which conformed to applicable standards.  All appraisals were required to be reviewed and ruled satisfactory by the Bank prior to loan funding.

d.      Borrowers must be creditworthy, demonstrate the capacity to provide a secondary recovery source (as principal or by guaranty) and must be able to submit financial statements, tax returns and project information.

e.      Because raw land and land development loans do not generate cash flow sufficient to support repayment, there is a significant risk associated with these types of loans, and their success is largely dependent upon current market conditions.

f.      The Bank's policy was to maintain a diversified loan portfolio, "because concentrations can expose the Bank to undue risk in the event of economic

1   adversity."  Loans in excess of 10 percent of the Bank's total, by industry, were
2   considered a concentration, and real estate loans specifically qualified as a
3   concentration.

4           g.     All approved CRM must be booked within 90 days from
5   approval.

6   **D.**     **Loan Underwriting Violations and Deficiencies**

7        35.    Between at least May 17, 2006, and March 28, 2008, each Defendant
8   repeatedly originated, recommended, and/or approved loans which violated the
9   PCNB Loan Policy and/or prudent underwriting standards by some or all of the
10  following acts or omissions, among others:

11          a.     Loans to Non-Creditworthy Borrowers — Causing or permitting
12  loans to be made to borrowers who were or should have been known to be
13  uncreditworthy and/or in financial difficulty;

14          b.     Inadequate Financial Information — Causing or permitting loans
15  to be made with inadequate or inaccurate financial information regarding the
16  creditworthiness of the borrower, the borrower's prospective source of repayment,
17  and the borrower's security, if any, and failing to make reasonable efforts to verify
18  the accuracy of such information;

19          c.     Speculative Lending — Causing or permitting speculative, high-
20  risk loans to be made, many after the economic decline of the real estate market was
21  well known;

22          d.     Failure to Perform Independent Underwriting — Causing or
23  permitting participation loans to be purchased without conducting appropriate
24  independent underwriting and credit analysis;

25          e.     Inadequate Appraisals — Causing or permitting loans to be made
26  on the basis of inadequate appraisals, or using appraisers with an inherent conflict of
27  interest with the prospective loan;

28          f.     Lending Outside Trade Area — Causing or permitting loans to

*ERVIN COHEN & JESSUP LLP*

1  be made outside the designated trade area of the Bank;

2         g.      Inadequate Wherewithal of Guarantors – Causing or permitting

3  loans to be made where the guarantors lacked the financial strength to support or

4  repay the loans.

5         h.      Inadequate Loan Documentation — Causing or permitting the

6  Bank to approve loans based on inadequate loan documentation and files; and/or

7         i.      Unsecured or Undersecured Loans — Causing or permitting

8  loans to be made on an unsecured or inadequately secured basis.

9  **VI.    <u>Transactions Causing Damages</u>**

10        36.    The loan transactions set forth below illustrate the very types of

11 failures, breaches, and violations of duty referenced above committed by each of the

12 Defendants, resulting in depletion of the Bank's capital.  The FDIC seeks

13 compensatory damages and other relief as a result of Defendants' conduct as

14 described below.

15 **A.     Borrower A[1]**

16        37.    On May 16, 2006, PCNB entered into a participation agreement with

17 BankFirst of South Dakota whereby PCNB purchased a $1 million interest in

18 BankFirst's $18.75 million loan to Borrower A.  The purpose of the loan was to

19 provide financing to fund the development of 362 acres of raw land in Banning,

20 California.

21        38.    In connection with this loan participation, Defendant Grinyer originated

22 the loan and prepared a CRM.  Defendants Hahn and Forkner (along with Grinyer)

23 evidenced their approvals of the loan by signing Grinyer's CRM on May 16, 2006.

24        39.    The Borrower A loan participation was unsafe and unsound, violated or

25

26        [1] In light of privacy considerations, the identity of specific borrowers in the transactions
   described herein is being withheld.  All pertinent information necessary for the Defendants to
27  identify the transactions, including the name of the borrower and loan number, has been provided
   to counsel for the Defendants.

28

14609.1:1710169.1

COMPLAINT

1  ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross

2  negligence, and breaches of fiduciary duty of Defendants Grinyer, Hahn, and

3  Forkner in originating and/or approving this loan in the following non-exclusive

4  particulars:

5          a.    The loan was a speculative, high risk undertaking requiring sale

6  of the underlying collateral to repay the loan, notwithstanding the warning in

7  PCNB's Loan Policy and warnings of federal regulators concerning this type of

8  lending.  The loan further violated the Bank's Loan Policy in that such speculative

9  lending was to be reserved for the Bank's best customers.

10          b.    PCNB had no previous banking relationship with Borrower A,

11  which was located out of the Bank's lending area as established in PCNB's Loan

12  Policy.

13          c.    The loan participation was made notwithstanding the fact that the

14  lead lender was located outside of the state of California.

15          d.    The appraisal supporting the loan was flawed in several

16  particulars, including (a) it used a "retrospective" "as is" date of July 2005 for a loan

17  made in May 2006; (b) the "as is" value of $40 million contradicted the actual $21

18  million purchase price of the property in 2005; and (c) it failed to provide any

19  comparables and utilized only a cost approach for the "as completed" valuation.

20          e.    Borrower A was a stand-alone entity created to own the property

21  and therefore had no independent wherewithal to support the debt.

22          f.    The sole guarantor was heavily involved in the real estate

23  market, and his cash flow to support the debt was marginal.

24          g.    PCNB failed to conduct independent underwriting of this

25  participation in violation of prudent banking practices and federal regulations,

26  instead relying on the credit analysis performed by the lead lender.

27          h.    Notwithstanding the speculative nature of the loan, Defendants

28  Grinyer, Hahn, and Forkner failed to take into account the declining real estate

ERVIN COHEN & JESSUP LLP

1  market which was already in effect when the loan was approved.  A December 2007

2  appraisal valued the property securing the loan at $14.5 million (less than half of the

3  previous appraiser's valuation), and noted that "market values have dropped

4  significantly during the last 18 months."

5          i.      Because the loan refinanced Borrower A's acquisition of the

6  property in 2005, the loan violated PCNB's Loan Policy which prohibited

7  refinancing acquisition loans made within the previous two years.

8          Based upon the above-listed deficiencies, Defendants identified above should

9  not have originated or approved this loan or allowed the Bank to fund the loan to

10  Borrower A, and their acts and omissions have caused damages.

11          40.     In the August 23, 2006 Board meeting, PCNB's directors criticized,

12  among other things, (a) the failure to independently underwrite the loan, (b) the

13  speculative nature of the loan to Borrower A, (c) the fact that Borrower A was not

14  one of the Bank's best customers, and (d) the risk inherent in allowing the lead

15  lender to control such a specialized credit.  Notwithstanding these criticisms, a

16  number of subsequent ADC/CRE loans contained the same deficiencies.

17          41.     By letter to the lead lender dated February 7, 2007, Defendant Grinyer

18  acknowledged the Bank's imprudent reliance on the lead lender's underwriting and

19  PCNB's failure to conduct independent underwriting concerning the loan.

20          42.     On January 30, 2009, BankFirst notified Borrower A of its default of its

21  obligations under the loan.  Prior to the anticipated foreclosure, BankFirst was

22  closed by the FDIC.

23          43.     On April 14, 2009, PCNB declared a $742,741 loss on the loan to

24  Borrower A.

25  **B.      Borrower B**

26          44.     On April 23, 2007, PCNB entered into a participation agreement with

27  Gilmore Bank whereby PCNB purchased a $1.9 million interest in Gilmore's $5.9

28  million loan to Borrower B.  The purpose of the loan was to fund the construction of

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1    a 21-unit condominium development in Los Angeles County, California.

2        45.    In connection with this loan participation, Defendants Grinyer, Hahn,

3    Forkner, and Cummings signed the CRM on or about April 6, 2007, and Defendants

4    Hahn, Forkner, and Cummings voted to approve the loan as members of PCNB's

5    DCC on April 11, 2007.

6        46.    The Borrower B loan participation was unsafe and unsound, violated or

7    ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross

8    negligence, and breaches of fiduciary duty of Defendants Grinyer, Hahn, Forkner,

9    and Cummings in recommending and/or approving this loan in the following non-

10   exclusive particulars:

11        a.    The loan was a speculative, high risk undertaking requiring sale

12   of the underlying collateral to repay the loan, notwithstanding the warning in

13   PCNB's Loan Policy and warnings of federal regulators concerning this type of

14   lending.

15        b.    Contrary to the Bank's Loan Policy, Borrower B and the

16   collateral were located outside of the Bank's designated lending territory.

17        c.    PCNB had no previous banking relationship with Borrower B or

18   the loan's guarantors, again contrary to PCNB's Loan Policy, with regard to this

19   speculative loan.

20        d.    The loan to Borrower B was recommended and approved

21   notwithstanding the fact that the borrower and guarantors did not have the financial

22   capacity to repay the loan.

23        e.    Notwithstanding the Bank's complete reliance on the collateral

24   in making this loan, the appraisal supporting the loan was flawed, a fact which was

25   recognized by Defendant Grinyer who performed the Bank's appraisal review.

26        f.    PCNB failed to conduct independent underwriting of this

27   participation in violation of prudent banking practices and federal regulations,

28   instead relying on the credit analysis performed by the lead lender.

g. Notwithstanding the speculative nature of the loan, Defendants Grinyer, Hahn, Forkner, and Cummings failed to take into account the declining real estate market which was already in effect when the loan was approved.

h. The CRM which Defendants Grinyer, Hahn, Forkner, and Cummings signed improperly assigned a risk rating of "2" to this loan, notwithstanding the weaknesses and deficiencies cited above and the fact that the lead lender assigned a risk rating of "3" in the credit analysis it provided to PCNB. As a participating lender, PCNB's risk was even greater than the risk of the lead lender.

Based upon the above-listed deficiencies, Defendants identified above should not have originated, recommended, or approved this loan or allowed the Bank to fund the loan to Borrower B, and their acts and omissions have caused damages.

47. An appraisal of the subject collateral in May 2008 reflected a bulk sale value of the property as being significantly less than the amount of the loan. Thereafter, PCNB declared a $434,875 loss on the loan to Borrower B on July 18, 2008.

**C.    Borrower C**

48. On May 18, 2007, PCNB entered into a loan with Borrower C in the amount of $750,000. The purpose of the loan was to finance the acquisition of furniture, fixtures, and equipment for a new restaurant to be opened in Lake Forest, California. The loan to Borrower C was one of several similar loans to affiliated restaurant companies originated by PCNB through a brokering relationship with Vision Capital Corporation.

49. In connection with the loan to Borrower C, Defendant Grinyer originated the loan and prepared a CRM dated May 10, 2007. Defendants Hahn, Forkner, and Cummings evidenced their recommendation that the loan be approved by signing the CRM on May 11, 2007, and they also voted to approve the loan as

ERVIN COHEN & JESSUP LLP

1    members of PCNB's Board of Directors on May 14, 2007.

2       50.    The loan to Borrower C was unsafe and unsound, violated or ignored

3 PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence,

4 and breaches of fiduciary duty of Defendants Grinyer, Hahn, Forkner, and

5 Cummings in originating, recommending, and/or approving this loan in the

6 following non-exclusive particulars:

7       a.    The loan was made for a restaurant startup, which was identified

8 as a high risk undertaking in the Bank's Loan Policy.

9       b.    While the loan had several guarantors, all were affiliated with the

10 borrower's principal, and all were in the restaurant business. Thus, all sources of

11 repayment were connected and reliant upon the success of the principal's restaurant

12 ventures.

13       c.    Notwithstanding the risks associated with restaurant lending, the

14 Bank loaned 100% of the value of the collateral, a violation of the Bank's Loan

15 Policy.

16       d.    Defendant Grinyer's CRM recognized that the projected

17 repayment source was the restaurant's cash flow, but the cash flow information on

18 Borrower C's operations through December 31, 2006, did not support the ability to

19 carry the debt.

20       e.    The CRM failed to adequately analyze the global cash flow of

21 various affiliated entities and individuals guarantying the loan.

22    Based upon the above-listed deficiencies, Defendants identified above should

23 not have originated, recommended, or approved this loan or allowed the Bank to

24 fund the loan to Borrower C, and their acts and omissions have caused damages.

25       51.    In late 2008, Borrower C and the loan's guarantors filed for bankruptcy

26 relief and the restaurant was closed. Shortly thereafter, PCNB declared a loss on the

27 loan to Borrower C in the amount of $670,247.

28

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

D.   **Borrower D**

52.   On June 22, 2007, PCNB entered into a participation agreement with Vineyard Bank whereby PCNB purchased a $1.8 million interest in Vineyard Bank's $10.455 million loan to Borrower D.  The purpose of the loan was to provide financing for the borrower to undertake extensive renovations to a luxury home in Bel Air, California.

53.   In connection with this loan participation, Defendant Adams originated the loan and prepared a CRM dated June 8, 2007.  Defendants Hahn, Cruse, and Cummings evidenced their recommendations of the loan by signing Adams's CRM on June 11, 2007, and Defendants Hahn, Forkner, and Cummings voted to approve the loan as members of PCNB's Board of Directors on June 13, 2007.

54.   The Borrower D loan participation was unsafe and unsound, violated or ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence, and breaches of fiduciary duty of Defendants Adams, Hahn, Forkner, Cruse, and Cummings in originating, recommending, and/or approving this loan in the following non-exclusive particulars:

a.   The loan was a speculative, high risk undertaking requiring sale of the underlying collateral to repay the loan, notwithstanding the warning in PCNB's Loan Policy and warnings of federal regulators concerning this type of lending.

b.   The property serving as collateral for the loan was located outside of the lending area prescribed in PCNB's Loan Policy.

c.   PCNB had no previous banking relationship with Borrower D and the loan's guarantors, who were located out of the Bank's lending area as established in PCNB's Loan Policy.  The loan further violated the Bank's Loan Policy in that such speculative lending was to be reserved for the Bank's best customers.

d.   Borrower D was a stand-alone entity created to own the subject

1  property and therefore had no independent wherewithal to support the debt.  Both

2  guarantors were heavily invested in the local real estate market, and their cash flow

3  was limited.

4         e.     PCNB failed to conduct independent underwriting of this

5  participation in violation of prudent banking practices and federal regulations,

6  instead relying on the credit analysis performed by the lead lender.  Defendant

7  Adams' CRM indicated on numerous occasions that he was relying on the lead

8  bank's underwriting.

9         f.     While Defendant Adams in large measure copied the credit

10  analysis from Vineyard Bank in his CRM, he specifically omitted the marginal

11  credit score of one of the loan's guarantors.

12         g.     Notwithstanding the speculative nature of the loan, Defendants

13  Adams, Hahn, Forkner, Cruse, and Cummings failed to take into account the

14  declining real estate market which was already in effect when the loan was

15  approved.  In fact, the January 2007 appraisal of the property securing the loan

16  noted the slowdown in the Los Angeles market and potential oversupply of

17  properties.

18       Based upon the above-listed deficiencies, Defendants identified above should

19  not have originated, recommended, or approved this loan or allowed the Bank to

20  fund the loan to Borrower D, and their acts and omissions have caused damages.

21       55.    The renovation project incurred significant construction delays and

22  work was halted prior to completion.  Vineyard Bank notified Borrower D that it

23  was in default of its obligations under the loan in May 2009.  Prior to the anticipated

24  foreclosure, Vineyard Bank was closed by the FDIC on July 2009.

25       56.    On or about September 15, 2009, PCNB declared a $559,110 loss on

26  the loan to Borrower D.

27  **E.**    **Borrower E**

28       57.    On August 22, 2007, PCNB entered into a participation agreement with

ERVIN COHEN & JESSUP LLP

1  First Private Bank & Trust of Irvine, California, whereby PCNB purchased a $2

2  million interest (PCNB's legal lending limit) in First Private's $20 million loan to

3  Borrower E.  The purpose of the loan was to provide financing to the borrower for

4  the acquisition and rehabilitation of two apartment buildings located in Arizona.

5      58.   In connection with this loan participation, Defendant Adams originated

6  the loan and prepared the CRM dated August 1, 2007.  Defendants Forkner, Cruse,

7  and Cummings evidenced their recommendation of the loan by signing (or in the

8  case of Cummings, affirming by telephone) the CRM on August 2, 2007, and

9  Defendants Hahn, Forkner, and Cummings voted to approve the loan as members of

10  PCNB's Board of Directors on August 6, 2007.

11      59.   The Borrower E loan participation was unsafe and unsound, violated or

12  ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross

13  negligence, and breaches of fiduciary duty of Defendants Adams, Hahn, Forkner,

14  Cruse, and Cummings in originating, recommending and/or approving this loan in

15  the following non-exclusive particulars:

16      a.   The loan was a speculative, high risk undertaking requiring sale

17  of the underlying collateral or permanent financing to repay the loan,

18  notwithstanding the warning in PCNB's Loan Policy and warnings of federal

19  regulators concerning this type of lending.

20      b.   Contrary to the Bank's Loan Policy, Borrower E and the loan's

21  collateral were located outside of the Bank's designated lending territory.

22      c.   PCNB had no previous banking relationship with Borrower E or

23  the guarantors, again contrary to PCNB's Loan Policy, which stated that speculative

24  loans were to be reserved for the Bank's best customers.

25      d.   Borrower E and the loan's guarantors were heavily leveraged in

26  the real estate market and did not have the cash flow to support the debt.

27      e.   PCNB failed to conduct independent underwriting of this

28  participation in violation of prudent banking practices and federal regulations,

14609.1:1710169.1                       20
                                     COMPLAINT

1  instead relying on the credit analysis performed by the lead lender.

2          f.      Even though Defendant Adams copied verbatim much of First

3  Private Bank's loan analysis for his CRM, he failed to include First Private Bank's

4  cited weakness that the borrower and guarantors' "[g]lobal cash flow did not support

5  the debt."

6          g.      Borrower E's U.S. tax returns for 2004 and 2005 (the last

7  available years) reflected an average net income of negative $4 million, and the

8  guarantors' 2004 and 2005 tax returns reflected an average adjusted gross income of

9  negative $5.6 million.

10         h.      Notwithstanding the Bank's reliance on the collateral in making

11  this loan, Adams' CRM contained no discussion of appraisals on the two properties,

12  and the loan was recommended, approved and closed before the appraisals were

13  reviewed on the underlying collateral, in violation of the Bank's Loan Policy.

14         i.      Notwithstanding the speculative nature of the loan, and the fact

15  that the loan was made at the Bank's legal lending limit, Defendants Adams, Hahn,

16  Forkner, Cruse, and Cummings failed to take into account the declining real estate

17  market which was already in effect when the loan was approved.

18         j.      Defendant Adams' CRM improperly assigned a risk rating of "2"

19  to this loan, notwithstanding the weaknesses and deficiencies cited above and the

20  fact that the lead lender assigned a risk rating of "3" in the credit analysis it provided

21  to PCNB.  As a participating lender, PCNB's risk was even greater than the risk of

22  the lead lender.

23         k.      The appraisers were not on the Bank's approved appraiser list,

24  and a Bank-approved appraiser was not retained to conduct an independent appraisal

25  review in violation of the Bank's Loan Policy.

26         l.      A July 26, 2009 Internal Memorandum written by Senior Vice

27  President Philip Johnson criticized Adams' CRM, specifically citing "inadequacies"

28  relating to the lack of a collateral analysis.

1  Based upon the above-listed deficiencies, Defendants identified above should

2  not have originated, recommended, or approved this loan or allowed the Bank to

3  fund the loan to Borrower E, and their acts and omissions have caused damages.

4  60.  PCNB initially funded $1,645,500 on August 27, 2007, in connection

5  with this loan.  On December 24, 2007, PCNB's funded an additional $308,750, and

6  a third apartment complex was added as collateral.  The PCNB loan file contains no

7  evidence that PCNB received (or reviewed) an appraisal on the additional property

8  prior to funding.

9  61.  Borrower E suspended interest payments in April 2009, and the lead

10  bank issued a notice of default on May 29, 2009.  On June 26, 2009, Borrower E

11  filed for Chapter 11 bankruptcy protection.

12  62.  In July 2009 PCNB declared a $1,203,000 loss on the loan to Borrower

13  E.

14  **F.  Borrower F**

15  63.  On September 24, 2007, PCNB entered into a loan to Borrower F in the

16  amount of $2 million (PCNB's legal lending limit).  The purpose of the loan was to

17  refinance the borrower's acquisition of a 20-lot residential subdivision in Escondido,

18  California.

19  64.  In connection with the loan to Borrower F, Defendant Adams

20  originated the loan and prepared the CRM dated August 16, 2007.  Defendants

21  Hahn, Forkner, and Cruse evidenced their recommendation of the loan by signing

22  the CRM on September 5, 2007, and Defendant Hahn voted to approve the loan as a

23  member of PCNB's Board of Directors on September 7, 2007.

24  65.  The loan to Borrower F was unsafe and unsound, violated or ignored

25  PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence,

26  and breaches of fiduciary duty of Defendants Adams, Hahn, Forkner, and Cruse in

27  originating, recommending, and/or approving this loan in the following non-

28  exclusive particulars:

ERVIN COHEN & JESSUP LLP

14609.1:1710169.1

22

COMPLAINT

1    a.    The loan was a speculative, high risk undertaking, requiring sale
2 of the underlying collateral or permanent construction financing to repay the loan,
3 notwithstanding the warning in PCNB's Loan Policy and warnings of federal
4 regulators concerning this type of lending.

5    b.    PCNB had no previous banking relationship with Borrower F,
6 again contrary to PCNB's Loan Policy in that such speculative loans were to be
7 reserved for the Bank's best customers.

8    c.    Borrower F's tax returns did not reflect an ability to provide cash
9 flow to support the loan.  Moreover, bank account statements the Bank received for
10 Borrower F reflected less than the amount stated on his personal financial statement.

11    d.    The August 2007 appraisal obtained by Defendant Adams did
12 not properly evaluate the property on an "as is" basis, used dated comparables, and
13 failed to consider the recent purchase of the subject property, thereby arriving at an
14 inflated value.  Defendants Adams and Cruse reviewed and approved this appraisal.

15    e.    Defendant Adams' CRM revealed that the loan's broker was an
16 affiliated entity of the appraiser utilized by Defendant Adams for the loan, thereby
17 creating an impermissible conflict of interest which was or should have been known
18 to Defendants who originated, recommended, and/or approved this loan.

19    f.    Defendant Adams' CRM failed to properly analyze Borrower F's
20 financial condition and ability to repay the loan.

21    g.    Notwithstanding the speculative nature of the loan, and the fact
22 that the loan was made at the Bank's legal lending limit, Defendants Adams, Hahn,
23 Forkner, and Cruse failed to account for the declining real estate market which was
24 already in effect when the loan was approved.

25    h.    The loan violated PCNB's Loan Policy by re-financing a real
26 estate acquisition loan within two years of the making of the previous loan.

27    Based upon the above-listed deficiencies, Defendants identified above should
28 not have originated or approved this loan or allowed the Bank to fund the loan to

1   Borrower F, and their acts and omissions have caused damages.

2        66.    Borrower F filed for bankruptcy relief in December 2008.  In May

3   2009, PCNB instituted foreclosure proceedings.  An appraisal of the subject

4   collateral in May 2009 provided an "as is" value of $640,000.  As a result, PCNB

5   charged off $1,358,879 in July 2009.

6        67.    On October 8, 2009, PCNB became the owner of the property at

7   Trustee Sale.  Thereafter, the Bank charged off an additional $85,502, for a total loss

8   on the loan to Borrower F of $1,444,381.

9       **G.**    **Borrower G**

10        68.    On or about November 19, 2007, PCNB entered into a participation

11   agreement with 1st Centennial Bank whereby PCNB purchased a $2 million interest

12   (PCNB's legal lending limit) in 1st Centennial's $13.5 million loan to Borrower G.

13   The purpose of the loan was to fund the construction of 22 homes and 26 raw lots in

14   Riverside, California.

15        69.    In connection with this loan participation, Defendants Hahn, Forkner,

16   Cruse, and Cummings evidenced their recommendation of the loan by signing (or in

17   the case of Cummings, affirming by telephone) the Bank's July 9, 2007 CRM on

18   July 11, 2007, and Defendants Hahn, Forkner, and Cummings voted to approve the

19   loan as members of PCNB's Board of Directors on July 11, 2007.

20        70.    The Borrower G loan participation was unsafe and unsound, violated or

21   ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross

22   negligence, and breaches of fiduciary duty of Defendants Hahn, Forkner, Cruse, and

23   Cummings in recommending and/or approving this loan in the following non-

24   exclusive particulars:

25           a.    The loan was a speculative, high risk undertaking requiring sale

26   of the underlying collateral or permanent financing to repay the loan,

27   notwithstanding the warning in PCNB's Loan Policy and warnings of federal

28   regulators concerning this type of lending.

ERVIN COHEN & JESSUP LLP

b.      PCNB had no previous banking relationship with Borrower G or the loan's guarantors, again contrary to PCNB's Loan Policy, which stated that speculative loans were to be reserved for the Bank's best customers.

c.      Borrower G and the loan's guarantors were heavily leveraged in the real estate market and did not have the liquid assets or cash flow to support the debt.

d.      PCNB failed to conduct independent underwriting of this participation in violation of prudent banking practices and federal regulations, instead relying on the credit analysis and information provided by the lead lender.

e.      The loan to Borrower G further violated the Bank's Loan Policy in that it was not closed until over four months after loan approval.

f.      The PCNB CRM referenced only a stale financial statement on the primary guarantor and no tax return information.

g.      Notwithstanding the speculative nature of the loan, and the fact that the loan was made at the Bank's legal lending limit, Defendants Hahn, Forkner, Cruse, and Cummings failed to take into account the declining real estate market which was already in effect when the loan was approved and later funded.

h.      The Bank's CRM improperly assigned a risk rating of "2" to this loan, notwithstanding the weaknesses and deficiencies cited above and the fact that 1st Centennial assigned a risk rating of "5" in the June 12, 2007 credit analysis it provided to PCNB.  As a participating lender, PCNB's risk was even greater than the risk of the lead lender.

Based upon the above-listed deficiencies, Defendants identified above should not have originated, recommended, or approved this loan or allowed the Bank to fund the loan to Borrower G, and their acts and omissions have caused damages.

71.     In April 2008, less than 5 months after PCNB's participation, the loan to Borrower G was downgraded to "substandard" by 1st Centennial.  PCNB thereafter placed the loan on non-accrual status.

72. On January 23, 2009, 1st Centennial was closed by the FDIC, and the loan remained in default thereafter.

73. In December 2008, PCNB declared a $458,251.92 loss on the loan to Borrower G.

**H.    Borrower H**

74. On November 28, 2007, PCNB entered into a loan with Borrower H in the amount of $2,216,500, with $400,000 of the loan amount participated to another financial institution.  The purpose of the loan was to refinance the borrower's acquisition of the property and provide for the construction of four medical office condominiums in Escondido, California.

75. In connection with the loan to Borrower H, Defendant Grinyer originated the loan and prepared a CRM dated July 16, 2007.  Defendants Forkner, Cruse, and Cummings evidenced their recommendations of the loan by signing (or in the case of Cummings, affirming by telephone) Grinyer's CRM on July 17-18, 2007, and Defendants Forkner and Cummings voted to approve the loan as members of PCNB's Board of Directors on July 25, 2007.

76. The loan to Borrower H was unsafe and unsound, violated or ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence, and breaches of fiduciary duty of Defendants Grinyer, Forkner, Cruse, and Cummings in originating, recommending, and/or approving this loan in the following non-exclusive particulars:

a. The loan was a speculative, high risk undertaking requiring sale of the underlying collateral to repay the loan, notwithstanding the warning in PCNB's Loan Policy and warnings of federal regulators concerning this type of lending.

b. PCNB had no previous banking relationship with Borrower H or the loan's guarantors.  The loan further violated the Bank's Loan Policy in that such speculative lending was to be reserved for the Bank's best customers.

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

c.      The loan to Borrower H further violated the Bank's Loan Policy in that it was not closed until over four months after loan approval.

d.      Borrower H was a stand-alone entity created to own the property and therefore had no independent wherewithal to support the debt.

e.      The loan's guarantors were of marginal financial wherewithal. Their liquid assets and cash flow were inadequate to support the debt.

f.      The loan to Borrower H refinanced a previous acquisition loan for the property made less than two years prior, in violation of the Bank's Loan Policy.

g.      The loan was made notwithstanding clear evidence in the loan file that the construction of the buildings would cost more (between $164,000 and $275,000) than projected by the borrower.  In fact, in November 2008 the construction contractor advised that the project was initially underfunded.

h.      Notwithstanding the speculative nature of the loan, Defendants Grinyer, Forkner, Cruse, and Cummings failed to take into account the declining real estate market which was already in effect when the loan was approved.

i.      The Bank accepted inadequate financial statements from the loan's guarantors, and Defendant Grinyer's CRM did not accurately portray the guarantors' financial condition.

j.      The risk rating of "2" provided on Grinyer's CRM was not justified in light of the deficiencies cited above.

Based upon the above-listed deficiencies, Defendants identified above should not have originated, recommended, or approved this loan or allowed the Bank to fund the loan to Borrower H, and their acts and omissions have caused damages.

77.      Based on the need for additional funds for the project's construction, PCNB agreed to increase the total loan amount to $2,387,000, and its commitment to $1,987,000, in April 2008.

78.      Because of disputes with the contractor in May 2009, the project stalled

1   and was not completed.  PCNB estimated the project to be 80% complete and

2   $285,000 underfunded.  PCNB filed a Notice of Default on June 3, 2009.

3        79.    On September 30, 2009 PCNB declared a $708,230 loss on the loan to

4   Borrower H.

5   **I.     Borrower I**

6
7        80.    On December 28, 2007, PCNB entered into a loan to Borrower I in the

8   amount of $1.6 million.  The purpose of the loan was to refinance the borrower's

9   acquisition of the property and provide development costs for an 18-lot residential

10  subdivision in Escondido, California.

11       81.    In connection with the loan to Borrower I, Defendant Adams originated

12  the loan and prepared the CRM dated December 18, 2007.  Defendants Hahn,

13  Forkner, and Cruse evidenced their recommendation of the loan by signing the

14  CRM on December 18-20, 2007.

15       82.    The loan to Borrower I was unsafe and unsound, violated or ignored

16  PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence,

17  and breaches of fiduciary duty of Defendants Adams, Hahn, Forkner, and Cruse in

18  originating, recommending, and/or approving this loan in the following non-

19  exclusive particulars:

20            a.     The loan was a speculative, high risk undertaking, requiring sale

21  of the underlying collateral or permanent construction financing to repay the loan,

22  notwithstanding the warning in PCNB's Loan Policy and warnings of federal

23  regulators concerning this type of lending.

24            b.     PCNB had no previous banking relationship with Borrower I,

25  again contrary to PCNB's Loan Policy in that such speculative loans were to be

26  reserved for the Bank's best customers.

27            c.     Contrary to the Bank's Loan Policy, Borrower I resided in Utah,

28  well outside the Bank's geographic lending territory.

ERVIN COHEN & JESSUP LLP

d.      The November 2007 appraisal obtained by Defendant Adams did not properly evaluate the property on an "as is" basis, used dated comparables, and failed to consider the recent purchase of the subject property, thereby arriving at an inflated value.

e.      Defendant Adams' CRM revealed that the loan's broker was an affiliated entity of the appraiser utilized by Defendant Adams for the loan, thereby creating an impermissible conflict of interest, which was or should have been known to Defendants who originated, recommended, and/or approved this loan.

f.      Defendant Adams' CRM failed to adequately explain why over $700,000 of loan proceeds would be required for development.

g.      Notwithstanding the speculative nature of the loan, Defendants Adams, Hahn, Forkner, and Cruse failed to account for the declining real estate market which was already in effect when the loan was approved.

Based upon the above-listed deficiencies, Defendants identified above should not have originated, recommended, or approved this loan or allowed the Bank to fund the loan to Borrower I, and their acts and omissions have caused damages.

83.     As of the June 28, 2009 maturity date of the loan, PCNB had disbursed $1,021,419.  When Borrower I failed to repay the loan or provide a feasible plan for repayment, PCNB filed a Notice of Default.

84.     On September 30, 2009, PCNB declared a loss of $485,529 on the loan to Borrower I.

**J.      Borrower J**

85.     On March 28, 2008, PCNB entered into a loan with Borrower J in the amount of $2 million (PCNB's legal lending limit).  The purpose of the loan was to finance Borrower J's acquisition of a freight transporting and storage business in Pomona, California.  The loan to Borrower J was 75% guaranteed by the Small Business Association ("SBA").

86.     In connection with the loan to Borrower J, Defendants Hahn, Cruse,

1  and Cummings evidenced their approval of the loan by signing (or in the case of
2  Cummings, affirming by telephone) the Bank's CRM on March 13, 2008, and
3  Defendants Hahn and Cummings also voted to approve the loan as members of
4  PCNB's Board of Directors on March 18, 2008.

5       87.    The loan to Borrower J was unsafe and unsound, violated or ignored
6  PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence,
7  and breaches of fiduciary duty of Defendants Hahn, Cruse, and Cummings in
8  recommending and/or approving this loan in the following non-exclusive
9  particulars:

10       a.    The loan was a high-risk undertaking made in a declining
11  economy.  The fact that the loan was an SBA loan signifies that financing was not
12  available through customary sources.

13       b.    Borrower J and the business to be acquired were located outside
14  PCNB's lending area, contrary to the Bank's Loan Policy.

15       c.    The principals of Borrower J, who served as guarantors, did not
16  have the financial capacity to support the loan.

17       d.    The CRM approved by Defendants Hahn, Cruse, and Cummings
18  recognized that the collateral taken as security was insufficient to support the loan.

19       e.    Borrower J had limited experience in the freight transportation
20  and storage industry which increased the risk of the business going forward.

21       f.    In recommending and/or approving the loan to Borrower J,
22  Defendants Hahn, Cruse, and Cummings improvidently relied on a 75% SBA
23  guaranty as security for the loan, failing to recognize the Bank's exposure for
24  $500,000.

25       g.    Defendants Hahn, Cruse, and Cummings recommended and/or
26  approved the loan even though the company's net profits had decreased every year
27  from 2004 through 2007.

28       h.    An "Executive Summary" provided to the Bank by the

ERVIN COHEN & JESSUP LLP

1  prospective seller and buyer, which the Bank's CRM copied extensively, included

2  numerous questionable assumptions.

3         i.     The Dunn & Bradstreet report obtained by PCNB on the business

4  to be acquired shortly before the loan was closed indicated a credit score of "4"

5  (moderate to high risk of severe payment delinquency over the next 12 months) and

6  a financial stress score of "5" (high risk of severe financial stress over the next 12

7  months).

8       Based upon the above-listed deficiencies, Defendants identified above should

9  not have originated, recommended, or approved this loan or allowed the Bank to

10  fund the loan to Borrower J, and their acts and omissions have caused damages.

11       88.    Within months of loan origination, Borrower J reported that sales were

12  substantially off track due to the declining economy.  Borrower J defaulted on the

13  loan on November 3, 2008.

14       89.    On April 29, 2009, the Bank declared a loss in the amount of $468,710

15  on the loan to Borrower J, virtually all of its 25% exposure on this loan.

16  **K.**    **Borrower K**

17       90.    On March 28, 2008, PCNB entered into a loan with Borrower K in the

18  amount of $350,000.  The purpose of the loan was to provide working capital to

19  alleviate the borrower's cash flow problems.

20       91.    In connection with the loan to Borrower K, Defendants Hahn and Cruse

21  evidenced their approval of the loan by signing the Bank's CRM on March 26,

22  2008.

23       92.    The loan to Borrower K was unsafe and unsound, violated or ignored

24  PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence,

25  and breaches of fiduciary duty of Defendants Hahn and Cruse in approving this loan

26  in the following non-exclusive particulars:

27         a.     The loan was a high-risk undertaking with minimal chance of

28  repayment.  In fact, the Bank's CRM provided a risk rating of "7."

ERVIN COHEN & JESSUP LLP

b.      At the time of loan approval, Borrower K's current operating expenses exceeded its revenues.

c.      At the time of loan approval, Borrower K had existing loans with PCNB which had experienced significant and prolonged cash flow difficulties, and the borrower's last annual Profit and Loss statement reflected net income of negative $450,000.

d.      At the time of loan approval, the loan's guarantors had credit scores of 536 and 500.

e.      In approving the loan to Borrower K, Defendants Hahn and Cruse improvidently relied on a 75% SBA guaranty as security for the loan.

Based upon the above-listed deficiencies, Defendants identified above should not have originated or approved this loan or allowed the Bank to fund the loan to Borrower K, and their acts and omissions have caused damages.

93.      Only months after the loan was made, Borrower K and the guarantors filed for bankruptcy relief.  As such, the borrower's early default negated the SBA guaranty.

94.      On September 18, 2008, the Bank declared a total loss of $350,000 on this loan.

## VII.    CAUSES OF ACTION

### COUNT I

### ORDINARY NEGLIGENCE UNDER CALIFORNIA LAW

95.      The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1-94 above as if fully set out in this count.

96.      Each of the Defendants owed PCNB a duty of care under California common law to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in like position.  Also, each Defendant was further obligated to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws,

ERVIN COHEN & JESSUP LLP

1   rules, and regulations, as well as all applicable rules and policies of the Bank.

2       97.    Defendant Hahn, as COO and later CEO, a director, and a member of

3   the Bank's EMT, was responsible for the day-to-day management and operation of

4   the Bank and had the obligation to exercise the degree of diligence, care, and skill

5   that ordinarily prudent persons in like positions would exercise under similar

6   circumstances in management, oversight, and conduct of the Bank's business.

7   These duties included, but were not limited to, effectively managing and preserving

8   the Bank's resources; ensuring that the Bank had adequate policies, procedures, and

9   internal controls relating to, among other things, ADC/CRE and other high-risk

10  lending; that the Bank adhered to its lending and credit policies, loan approval

11  process, and loan and credit administration practices; that the Bank complied with

12  banking statutes and regulations; that the Bank did not make imprudent loans and

13  extensions of credit as part of a plan to unreasonably grow the Bank; and that loans

14  he recommended and/or approved complied with the Bank's Loan Policy and

15  prudent and sound lending practices.  As COO and a member of the Bank's EMT,

16  Hahn was responsible for reviewing CRM and recommending large loans to

17  PCNB's DCC and Board and was responsible for supervising various officers,

18  including, but not limited to, Defendants Grinyer, Cruse, and Adams.

19      98.    Defendant Forkner, as CEO, a director, and a member of the Bank's

20  EMT, was responsible for the overall management of the Bank including, but not

21  limited to, its lending function, and had the obligation to exercise the degree of

22  diligence, care, and skill that ordinarily prudent persons in like positions would

23  exercise under similar circumstances in management, oversight, and conduct of the

24  Bank's business.  These duties included, but were not limited to, effectively

25  managing and preserving the Bank's resources; ensuring that the Bank had adequate

26  policies, procedures, and internal controls relating to, among other things,

27  ADC/CRE and other high-risk lending; that the Bank adhered to its lending and

28  credit policies, loan approval process, and loan and credit administration practices;

ERVIN COHEN & JESSUP LLP

1  that the Bank complied with banking statutes and regulations; that the Bank did not

2  make imprudent loans and extensions of credit as part of a plan to unreasonably

3  grow the Bank; and that loans he recommended and/or approved complied with the

4  Bank's Loan Policy and prudent and sound lending practices.  As CEO and a

5  member of the Bank's EMT, Forkner was also responsible for reviewing CRM and

6  recommending large loans to PCNB's DCC and Board and supervising various

7  officers, including, but not limited to, Defendants Hahn, Grinyer, Cruse, and Adams.

8       99.   Defendant Cummings, as a director and DCC Chairman, as well as a *de*

9  *facto* member of the Bank's EMT and a paid lending consultant, was also

10  responsible for the Bank's lending function and had the obligation to exercise the

11  degree of diligence, care, and skill that ordinarily prudent persons in like positions

12  would exercise under similar circumstances in management, oversight, and conduct

13  of the Bank's business.  These duties included, but were not limited to, ensuring that

14  the Bank had adequate policies, procedures, and internal controls relating to, among

15  other things, ADC/CRE and other high-risk lending; that the Bank adhered to its

16  lending and credit policies, loan approval process, and loan and credit

17  administration practices; that the Bank complied with banking statutes and

18  regulations; that the Bank did not make imprudent loans and extensions of credit as

19  part of a plan to unreasonably grow the Bank; and that the loans he recommended

20  and/or approved complied with the Bank's Loan Policy and prudent and sound

21  lending practices.  As DCC Chairman and a *de facto* member of the EMT,

22  Cummings was responsible for reviewing CRM and recommending large loans to

23  PCNB's DCC and Board, and also was responsible for supervising the Bank's

24  CCOs, namely Grinyer, Cruse, and Adams.

25       100.  Defendant Grinyer, as CCO, a director and a member of the Bank's

26  EMT, reported to Defendants Hahn, Forkner, and Cummings and was responsible

27  for establishing and maintaining the Bank's credit policy.  Grinyer had the

28  obligation to exercise the degree of diligence, care, and skill that ordinarily prudent

ERVIN COHEN & JESSUP LLP

.

-

-

-

-

persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business. These duties included, but were not limited to, ensuring that the Bank had adequate loan policies, procedures, and internal controls relating to, among other things, ADC/CRE and other high-risk lending; that the Bank adhered to its policies, procedures, and controls; and that the Bank complied with banking statutes/regulations and prudent and sound lending practices. As CCO and a member of the EMT, Grinyer was responsible for reviewing CRM and recommending large loans to PCNB's DCC and Board, and also responsible for supervising the Bank's lending personnel. As a loan originator, he was responsible for underwriting loans in accordance with the Bank's Loan Policy and safe and sound practices and preparing CRM which were accurate and complete and in accord with the Bank's Loan Policy.

101.   Defendant Cruse, as CCO and a member of the Bank's EMT, reported to Defendants Hahn, Forkner, and Cummings and was responsible for establishing and maintaining the Bank's credit policy. Cruse had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business. These duties included, but were not limited to, ensuring that the Bank had adequate loan policies, procedures, and internal controls relating to, among other things, ADC/CRE and other high-risk lending; that the Bank adhered to its policies, procedures, and controls; and that the Bank complied with banking statutes/regulations and prudent and sound lending practices. As CCO and a member of the EMT, Cruse was responsible for reviewing CRM and recommending large loans to PCNB's DCC and Board, and also responsible for supervising the Bank's lending personnel.

102.   Defendant Adams, as Executive Vice President and Real Estate Industries Group Manager, among other duties, was charged with management oversight of ADC/CRE loans as described below. Adams had the obligation to

ERVIN COHEN & JESSUP LLP

14609.1:1710169.1
35
COMPLAINT

1   exercise the degree of diligence, care, and skill that ordinarily prudent persons in

2   like positions would exercise under similar circumstances in management,

3   oversight, and conduct of the Bank's ADC/CRE lending.  These duties included, but

4   were not limited to, ensuring that the Bank adhered to its policies, procedures, and

5   controls, complied with banking statutes and regulations, and put the interests of the

6   Bank ahead of any personal interests he had to earn commission income from

7   originating loans.  Adams was responsible for ensuring that the ADC/CRE loans for

8   which he had responsibilities were made in a prudent and sound manner and in

9   accord with the Bank's Loan Policy, that loans which he originated and

10  recommended were properly underwritten, and that CRM were accurate and

11  complete, with all necessary information provided to his superiors.

12      103.   By their actions and inactions, as described specifically and generally

13  herein, Defendants Hahn, Forkner, Cummings, Grinyer, Cruse, and Adams

14  repeatedly failed and neglected to perform their respective duties with due care and

15  diligence and took actions and made decisions without regard to the significant risks

16  involved, constituting breaches of their duties of care, as follows:

17          a.      As to Defendant Hahn, his negligent (and grossly negligent) acts

18  included, without limitation:

19              (i)     Pursuing an aggressive lending strategy that placed short-

20  term income and profits ahead of compliance with the Bank's policies, banking

21  statutes and regulations, and prudent and sound lending practices;

22              (ii)    Failing to ensure that the Bank's lending complied with

23  the Bank's policies and procedures, banking statutes and regulations, and prudent

24  and sound lending practices;

25              (iii)   Failing to monitor and supervise subordinate officers and

26  employees of the Bank with respect to ADC/CRE and other high-risk lending;

27              (iv)    Recommending and/or approving ADC/CRE and other

28  high-risk loans, which violated the Bank's Loan Policy and were unsafe and

ERVIN COHEN & JESSUP LLP

1  unsound;

2        (v)    Recommending and/or approving loans that had not been

3  properly underwritten prior to funding;

4        (vi)   Failing to ensure that ADC/CRE and other high-risk loans

5  made by the Bank were safe, sound, and reasonable, and that the Bank had a

6  reasonable prospect of being repaid by the debtors;

7        (vii)  Failing to implement and follow sound loan underwriting

8  and credit administration practices;

9        (viii) Failing to implement prudent risk management strategies

10  by, among other things, allowing dangerous concentrations in ADC/CRE loans;

11        (ix)   Failing to adhere to the Bank's Loan Policy and failing to

12  ensure that Bank management followed the Loan Policy;

13        (x)    Failing to properly supervise, manage, and oversee the

14  Bank's loan operations; and

15        (xi)   Failing to properly manage and preserve the Bank's

16  resources.

17        b.    As to Defendant Forkner, his negligent (and grossly negligent)

18  acts included, without limitation:

19        (i)    Pursuing an aggressive lending strategy that placed short-

20  term income and profits ahead of compliance with the Bank's policies, banking

21  statutes and regulations, and prudent and sound lending practices;

22        (ii)   Failing to ensure that the Bank's lending complied with

23  the Bank's policies and procedures, banking statutes and regulations, and prudent

24  and sound lending practices;

25        (iii)  Failing to monitor and supervise subordinate officers and

26  employees of the Bank with respect to ADC/CRE and other high-risk lending;

27        (iv)  Recommending and/or approving ADC/CRE and other

28  high-risk loans which violated the Bank's loan policy and were unsafe and unsound;

1               (v)    Recommending and/or approving loans that had not been

2 properly underwritten prior to funding;

3            (vi)   Failing to ensure that ADC/CRE and other high-risk loans

4 made by the Bank were safe, sound, and reasonable, and that the Bank had a

5 reasonable prospect of being repaid by the debtors;

6           (vii)  Failing to implement and follow sound loan underwriting

7 and credit administration practices;

8          (viii) Failing to implement prudent risk management strategies

9 by, among other things, allowing dangerous concentrations in ADC/CRE loans;

10         (ix)   Failing to adhere to the Bank's Loan Policy and failing to

11 ensure that Bank management followed the Loan Policy;

12         (x)    Failing to properly supervise, manage, and oversee the

13 Bank's loan operations; and

14         (xi)   Failing to properly manage and preserve the Bank's

15 resources.

16     c.    As to Defendant Cummings, his negligent (and grossly

17 negligent) acts included, without limitation:

18         (i)    Pursuing an aggressive lending strategy that placed short-

19 term income and profits ahead of compliance with the Bank's policies, banking

20 statutes and regulations, and prudent and sound lending practices;

21         (ii)   Failing to ensure that the Bank's lending complied with

22 the Bank's policies and procedures, banking statutes and regulations, and prudent

23 and sound lending practices;

24         (iii)  Failing to properly supervise the Bank's CCOs;

25         (iv)  Recommending and/or approving ADC/CRE and other

26 high-risk loans which violated the Bank's Loan Policy and were unsafe and

27 unsound;

28         (v)    Recommending and/or approving loans that had not been

1  properly underwritten prior to funding;

2        (vi)    Failing to ensure that ADC/CRE and other high-risk loans

3  made by the Bank were safe, sound, and reasonable, and that the Bank had a

4  reasonable prospect of being repaid by the debtors;

5        (vii)   Failing to implement and follow sound loan underwriting

6  and credit administration practices;

7        (viii)  Failing to implement prudent risk management strategies,

8  by, among other things, allowing dangerous concentrations in ADC/CRE loans;

9        (ix)    Failing to adhere to the Bank's Loan Policy and failing to

10  ensure that Bank management followed the Loan Policy; and

11        (x)    Failing to properly supervise, manage, and oversee the

12  Bank's loan operations.

13      d.    As to Defendant Grinyer, his negligent (and grossly negligent)

14  acts included, without limitation:

15        (i)    Failing to comply with the Bank's Loan Policy and

16  prudent and sound lending practices in originating, underwriting, recommending,

17  and approving ADC/CRE and other high-risk loans;

18        (ii)   Failing to ensure that the Bank's ADC/CRE and other

19  high-risk lending complied with the Bank's policies and procedures, banking

20  statutes and regulations, and prudent and sound lending practices;

21        (iii)  Failing to monitor and supervise subordinate officers and

22  employees of the Bank with respect to ADC/CRE and other high-risk lending;

23        (iv)  Preparing and submitting CRM that were incomplete

24  and/or otherwise deficient;

25        (v)    Failing to ensure that ADC/CRE loans and other high-risk

26  loans made by the Bank were safe, sound, and reasonable, and that the Bank had a

27  reasonable prospect of being repaid by the debtors;

28        (vi)   Failing to perform independent underwriting on

ERVIN COHEN & JESSUP LLP

1  participation loans he originated and recommended;

2            (vii)   (vii)   Failing to implement and follow sound loan

3  underwriting and credit administration policies;

4            (viii)  Failing to maintain the quality, safety and soundness of the

5  Bank's credit portfolio; and

6            (ix)    Originating, recommending, and/or approving loans that

7  had not been properly underwritten prior to funding.

8        e.    As to Defendant Cruse, his negligent (and grossly negligent) acts

9  included, without limitation:

10           (i)     Failing to comply with the Bank's Loan Policy and

11 prudent and sound lending practices in recommending and approving ADC/CRE

12 and other high-risk loans;

13           (ii)    Failing to ensure that the Bank's ADC/CRE and other

14 high-risk lending complied with the Bank's policies and procedures, banking

15 statutes and regulations, and prudent and sound lending practices;

16           (iii)   Failing to monitor and supervise subordinate officers and

17 employees of the Bank with respect to ADC/CRE and other high-risk lending;

18           (iv)    Failing to ensure that ADC/CRE loans made by the Bank

19 were safe, sound, and reasonable, and that the Bank had a reasonable prospect of

20 being repaid by the debtors;

21           (v)     Failing to implement and follow sound loan underwriting

22 and credit administration policies;

23           (vi)    Failing to maintain the quality, safety, and soundness of

24 the Bank's credit portfolio;

25           (vii)   Recommending and/or approving loans that had not been

26 properly underwritten prior to funding.

27        f.    As to Defendant Adams, his negligent (and grossly negligent)

28 acts included, without limitation:

1         (i)     Originating and recommending ADC/CRE and other high-

2 risk loans which were not properly underwritten and which violated the Bank's

3 Loan Policy;

4         (ii)    Failing to ensure that the Bank's ADC/CRE lending

5 complied with the Bank's policies and procedures, banking statutes and regulations,

6 and prudent and sound lending practices;

7         (iii)   Failing to independently underwrite participation loans

8 that he originated and recommended;

9         (iv)   Failing to ensure that ADC/CRE loans made by the Bank

10 were safe, sound, and reasonable, and that the Bank had a reasonable prospect of

11 being repaid by the debtors;

12         (v)    Failing to provide accurate and complete CRM on the

13 loans he originated and recommended; and

14         (vi)   Allowing impermissible conflicts of interest with regard to

15 the brokering of loans.

16     104.  As a direct and proximate result of Defendants' negligence, the Bank

17 suffered millions of dollars in damages, in an amount to be proved at trial.

18     105.  With respect to their negligent actions and inactions, each Defendant is

19 jointly and severally liable for all damages for each loan he was negligent in

20 originating, recommending, and/or approving.

21     106.  All Defendants, with the exception of Cummings, served as titled

22 executive officers of the Bank.  Cummings, as DCC Chairman, *de facto* member of

23 the Bank's EMT, supervisor of the Bank's CCOs, and a paid lending consultant for

24 the Bank, acted as an executive officer of the Bank at all material times.

25     107.  Accordingly, Defendants are not protected by California's Business

26 Judgment Rule, which does not apply to officers or to directors who also served as

27 officers.  See FDIC v. Hawker, C.A. No. 1:12-CV-00127 (E.D. Cal. 6/7/12); FDIC

28 v. Perry, 2011 WL-7178544 (C.D. Cal. 12/13/11).  Moreover, even if the business

ERVIN COHEN & JESSUP LLP

1    judgment rule were applicable, which is denied, a fundamental requirement of that

2    rule is the obligation to exercise reasonable diligence, which obligation was not met

3    by Defendants.

4                              **COUNT II**

5            **GROSS NEGLIGENCE CLAIMS UNDER 12 U.S.C. § 1821(K)**

6            108.   Plaintiff re-alleges and incorporates by reference the allegations

7    contained in paragraphs 1-107 above as if fully set out in this count.

8            109.   Section 1821(k) of the Financial Institutions Reform, Recovery and

9    Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and

10   officers of failed financial institutions may be held liable to FDIC receiverships for

11   loss or damage caused by their "gross negligence," as defined by applicable state

12   law.  California law defines "gross negligence" as the extreme departure from the

13   ordinary standard of conduct.

14           110.   In the alternative, the cumulative nature of the repeated acts and

15   omissions of each of the Defendants, described particularly in paragraphs 35-94 and

16   97-103 of this Complaint, and especially in light of the Bank's significant over-

17   concentration in speculative ADC and CRE loans notwithstanding the cratering of

18   the local and national real estate market, constitute gross negligence under

19   California law.

20           111.   As a direct and proximate result of Defendants' gross negligence, the

21   Bank suffered millions of dollars in damages, in an amount to be proved at trial.

22           112.   With respect to their grossly negligent actions and inactions, each

23   Defendant is jointly and severally liable for all damages for each loan he was

24   grossly negligent in originating, recommending, and/or approving.

25                             **COUNT III**

26                     **BREACH OF FIDUCIARY DUTY**

27           113.   Plaintiff re-alleges and incorporates by reference the allegations

28   contained in paragraphs 1-112 above as if fully set out in this count.

14609.1:1710169.1                          42
                                        COMPLAINT

114.   Under California law, as officers and/or directors of the Bank, Defendants owed PCNB fiduciary duties of loyalty, obedience, due care, and diligence, as well as the duty to act in good faith and in the best interests of the Bank.  Thus, Defendants owed a duty to the Bank to adhere diligently and in good faith to the Bank's Loan Policy as well as laws, regulations, and guidelines established to ensure that PCNB operated in a safe and sound matter.

115.   In the alternative, the acts and omissions of each of the Defendants, described generally herein and particularly in paragraphs 35-94 and 97-103 of this Complaint, constitute breaches of their fiduciary duties to the Bank.

116.   As a direct and proximate result of Defendants' breach of fiduciary duty, the Bank suffered millions of dollars in damages, in an amount to be proved at trial.

117.   With respect to their breaches of fiduciary duties, each Defendant is jointly and severally liable for all damages for each loan he originated, recommended, and/or approved.

## VIII.  **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Federal Deposit Insurance Corporation, as Receiver for Pacific Coast National Bank, demands a trial by jury and judgment in its favor against Defendants as follows:

1.   For compensatory damages and other damages, jointly and severally, against Defendants for their negligence, gross negligence, and/or breaches of fiduciary duty that resulted in damages;

2.   For prejudgment and other appropriate interest pursuant to 12 U.S.C. Sec. 1821(l) and California law;

3.   Such other and further relief as the Court deems just and proper; and

4.   Plaintiff demands a trial by jury on all issues.

DATED: November 6, 2012          ERVIN COHEN & JESSUP LLP
                                         Allan B. Cooper

                                 By: _____
                                         Allan B. Cooper
                                         Attorneys for FEDERAL DEPOSIT
                                         INSURANCE CORPORATION, as
                                         Receiver for PACIFIC COAST
                                         NATIONAL BANK, Plaintiff

Of Counsel:                      KING, KREBS & JURGENS, P.L.L.C.
                                         Robert J. Burvant

14609.1:1710169.1                        44
                                      COMPLAINT